Good morning, Your Honors. I thank the Court and Alex and the Morales for presenting the petitioner, Rudolph Perekhanov. I'd like to reserve a few minutes for rebuttal. The main issue in this case is whether the BIA erred in affirming the adverse curability determination. In affirming the adverse curability determination, the Board cited four different reasons for that. The first of the reasons was whether or not the respondent should be credible regarding his testimony as to the home invasion and specifically as to the injuries that he claimed. The Board noted that he was inconsistent in terms of the alleged injuries that he testified to and that the initial statement did not mention that he had been injured. However, his testimony was consistent, his oral testimony was consistent that he was injured during that home invasion and also his mother's testimony before the asylum officer also corroborated his claim that he had been injured. She did mention that her son, the petitioner, had been injured during that incident. Moreover, that incident itself was not questioned by the judge and it was accepted as a matter of fact and the only issue was as to whether or not he was injured and again he was consistent regarding that. The second issue that the Board raised was whether or not the mother was beaten because she did not mention that in her own statement. The petitioner mentioned that she had been beaten because that was his recollection and his belief. The fact that his mother had not mentioned it in her own statement, that's a separate issue over which the petitioner would have been responsible. She was pushed up against a wall and had guns pointed at her. She said that, didn't she? Yes. Yeah. I mean everything else was consistent. It was only the issue of whether or not she was injured and the petitioner's testimony was that she was injured, that she was pushed around and she was injured. The third item that was mentioned was whether or not the police had investigated the 1991 incident and the petitioner's statement was that the police had shown up, had taken a report, meaning had asked what was going on and maybe written something down. However, they did nothing about it and they took no action whatsoever to investigate as to the people who were responsible for the incident where the implication in a sense is basically that the police chose not to investigate because in a way it implicated other agencies as well. It was not the case of the government. The petitioner's testimony was that the people conducting that invasion arrived in military trucks, were dressed in camouflage, implying that they were somehow associated with the military. Let's assume everything you're saying is right. Yes. And there should have been a finding of past persecution. Yes. Then they go, the BIA goes on to say that the, with regard to a fear of future persecution, that the State Department country reports and objective evidence in the record are more persuasive than Dr. Dickmajian's testimony, i.e., that the, which I understand to mean there is no fear, well-founded fear or likelihood of future persecution. And that doesn't seem to be infected with a burden shift. So why don't we just look into that? Well, and that's actually your correct, Your Honor. I mean, in a sense, they go on to that issue. However, they did not address, if he had been found to have established past persecution, he would have been entitled to the presumption.  And the burden would have shifted to the government. But the way it's written, it appears that they made a finding that the State Department country reports are more persuasive. So they seem to have actually put the burden on the government. On the government or the position? The government. I'm saying because they found the State Department country reports and other objective evidence, which provide no objectively reasonable basis for the respondents' fear, are more persuasive. Over the? Over Dr. Dripkin-Majian's testimony. So it doesn't appear. It appears that the lack of the presumption may not have mattered. I think, in a sense, what they did, Your Honor, I mean, I think they stepped over the whole issue of the presumption. Because the presumption, in order for the presumption to be overcome, they would have to establish that he himself did not have a particularized, well-founded fear of future persecution. They could not have used the country conditions to rebut that presumption. And they didn't do any of that analysis. So in that sense, I think that it's somewhat misguided. Also, I think this counting the testimonies, the expert witness testimony was also an error. It's kind of like the last case in the sense that all of this happened a very long time ago. And the evidence in the record seems to be largely that it was a time limit. This problem between the Georgians and the Armenians in Georgia was in the immediate aftermath of the collapse of the Soviet Union and doesn't seem to be a problem anymore. Well, I'm not sure that that would necessarily be the case, Your Honor. I think what happened as a result of all the problems is that it cost a lot of the Armenians to leave Georgia. So the population is not as huge as it used to be. So the problems may not be as pronounced. They may not register as much as they used to. And I think that's where some of the anecdotal testimony that the expert witness, the major mentioned, that his inquiries into people that had moved away from Georgia comes into play. It gives him a sense as to the actual problems that they encountered while living in Georgia. And, again, that would require a separate eventual hearing to determine whether or not those problems still exist. And that did not happen in this instance. Why would it require a separate hearing? It just would require another determination on the existing record, no? And I think based on the existing record, I would argue that his testimony, the testimony of the witness of the expert witness. But they discounted his testimony almost entirely. Are you taking that on? I'm sorry. They basically didn't think his testimony was worth much of anything. Well, they say that, Your Honor, but I think they believe that these incidents did happen to the family of which he is a member. They believe that his mother suffered the attack, that his sister was raped. Well, they didn't believe it. I'm assuming now that they would believe it. Go ahead. Yes. And so they did believe that aspect of it. And if so, that would have qualified him for asylum based on the past persecution. And the issue as to whether or not the country conditions had changed. When was the last incident of which he? 2001, I believe, Your Honor. And it was a kidnapping that he had testified to. He claimed he was kidnapped or something? Yes. And it's all, you know, in terms of the discrepancy or the inconsistency that were cited, it related to whether or not, you know, minor inconsistencies, whether it was 1996 or 1998. And I think he testified consistently during oral testimony that any discrepancy was related to a transcription or like the person translated the statement. And other than that, he was consistent that it was in 1996 and 2001. And based on that, he should have been found credible. And based on the incidents that he suffered, he should have been found to have suffered past persecution, should have had the potential to walk on it for future persecution and thus eligibility for asylum. Moreover, perhaps he should have also been found to be entitled to mention his torture release because he testified that the attachment of his family were perpetrated by paramilitary groups. And that part of the treatment involved the rape of his sister, for example. And rape didn't happen to him. But, I mean, rape has been found to be a form of torture. And that presumably those same groups that are now associated with the government will continue to persecute people like himself of Armenian descent. There are no questions. Thank you. Thank you. Good afternoon. This time, your honors. Again, on behalf of the respondent. Petitioner simply, excuse me, failed to testify consistently and credibly. And the agency therefore properly found that he did not prove past persecution. The inconsistencies relied upon by the agency do go to the heart of petitioner's claim. And what is fatal here is the evolving nature of the substance of his testimony. Now, wait a minute, counsel. We're going to have an argument again. Why don't you look at page 98 of the transcript. Actually, start at page 97. This is the judge to counsel for the petitioner. He says, but sir, see, that's the problem. She said, who owned the house? She didn't say, were your brother and grandfather alive? Okay. So please listen to the question and answer the question. The question was, who owned the house? Answer, father. Okay. That's what we need to know. Please try to answer the question. All right. Now, all right. And so what happened when they broke, when these people broke the door down? They came into the house, started cursing us. You Armenians, your mother is this and that, and then your nationality. You should not be living here while Georgians are homeless. We will never forgive you. Your families are going to suffer a lot. Question, what did they do? They separated us. They took us to different rooms. I was beat up so badly, I was indiscernible. They beat us with their boots and with the butts of their rifles. My kidneys, I was unconscious. Okay. That's when he says that. Now he gets asked later on, on cross-examination. What page is that? That was on page 98. Then you go to the cross-examination, and what the supposed amplifications are. I believe perhaps it's page 123, Your Honor. Thank you. Sure. Okay. That may be a little bit intimate. No, that's okay. What was that page again? 123, Your Honor. 123. All right. Okay, and so now the question, this is on cross. Okay, now, sir, you said that when you were injured, yes, what were the extent of your injuries? They were hitting me in the kidneys. My stomach was hurting. I lost two teeth. They were kicking me. Okay, so you were injured in the stomach. Were you injured anywhere else? That's it, and so on. Now, why is that inconsistent or amplification? He's just been admonished by the judge to answer the question. Correct. He did. He answered the direct question. Now he goes on, and he adds that his teeth were knocked out because he was asked a specific question. What were the extent of your injuries? Why wouldn't he add something? Does he have to give him the, you know, what did they do to you? He's supposed to give all-encompassing testimony? Absolutely. You're going to say absolutely? No, Your Honor, I apologize. Okay. I thought I was answering, but he was probably elaborating as the questions were asked of him. All right. The embellishment, the elaboration that we, the government, are referencing starts before his testimony. We have in the record petitioner's first written affidavit in which he failed to make any mention of any injuries. Does the IGA rely on that, though? I'm sorry, Your Honor? Does the IGA rely on that in any place? The discrepancies between his written and oral submissions? Yes. Where? Go to the immigration judge's decision, please. The, I believe it's pages 55 and 56 of the immigration judge's decision. We have to differentiate between what the board affirmed and what we have from the immigration judge here. The immigration judge made a mixed credibility finding. That is not entirely what the board affirmed, and thusly not entirely what's before this court on review. The immigration judge, I believe if I can see. What page is this now? I believe it's 55 and 56 of the immigration judge's decision. Well, you want to hold on for a minute? Sure. But the immigration judge credited that part, some of the testimony of him being injured. And I don't, where did he mention anything about the affidavit? I perhaps overspoke then, Your Honor. You did. And I apologize for that. But stepping back to what the petitioner said. You have to be careful. People's lives are at stake. This is not a game. This is a very serious matter. It is, Your Honor. And you're representing the government, as all the others are. So, you know, you've got to be careful when you make these representations. The way that the government has approached this case, Your Honor, from start to finish. We have petitioner's mother's asylum application. She prevailed. She appeared before an asylum officer. She told a consistent and coherent account. And thus, we have established the fact of a 1991 home invasion. The petitioner cannot come into immigration court and bootstrap his claim to that of his mother. Okay, but wait a minute. You just told me after I went through that reading that you were relying, the government was relying on something different. That's not what the BIA said. I thought I was reading what the BIA cited. First, the respondent initially testified that during a home invasion by members of the gang, he was beaten in the kidneys and knocked unconscious. On cross-examination, however, the respondent testified that he sustained injuries to his kidneys and his stomach, and that two of his teeth were knocked out. Now, what are you relying on, counsel? The cumulative inconsistencies evident in the record. You just said that that was proper elaboration, but you weren't relying on it. But the BIA did. Now, what are you telling us? It's the government's position in this case. I don't want to. What are you telling us? When you answer, you know, I carefully try to go through the record, okay? I used to try cases. We all did. It's important to understand if we're going to credit the IJ and his findings, then we want to read the testimony. Okay, now, I read the testimony. You tell me it's proper elaboration, and then you say you're not relying on that. You're relying on something else. But that's the first ground on which the BIA found and affirmed him not credible. The agency, in making that determination with respect to this 1991 home invasion, considered the documentary evidence as well as the testimony. But you told me you weren't relying on it. You made me go look at this BIA to find out why I was bothering with reading this testimony. And you told me that you were relying on something else, which made me go look at that to say, well, where's that? And the net result of this, and this is on a more mundane level than what Judge Ferguson was saying, is that you're not getting your argument out because you're not being straight with us about what's there, and therefore, you're being impeded. Because we're spending our time trying to check out why we think the opposite of what you're saying. And we turn out to be right. So. If we parse the testimony, I agree with Your Honor entirely that, viewing very narrowly the comparison between Petitioner's testimony on direct and his testimony on cross, it is not, on its face, inconsistent to elaborate regarding the extent of your interest. I'm sorry, counsel. The BIA says the immigration judge identified substantial discrepancies within Respondent's testimony and between his testimony at the hearing and evidence contained in the record of proceedings. And then they go on to cite precisely what I was reading. Now, how can you stand here and try and defend what you just said to us? Because I believe that that statement by the board that the immigration judge identified and relied upon substantial discrepancies purposes, sets off the paragraph that's to fall. There are several categories of inconsistencies. Counsel, you do not have credibility with this judge. I'm sorry. I sincerely apologize, Your Honor. And I hope you will. I'm going to ask you to have your supervisor listen to the transcript of this argument. My effort in defending the agency decisions that are before the Court has been to begin with Petitioner's burden and step through. I know what your structure is. I'm talking about a discrete inquiry about the record, about the record and tied to the BIA decision. I very sincerely apologize if I misspoke in initially agreeing with Your Honor's characterization of those portions between direct and cross in which Petitioner merely elaborated. Yes. But the problem in this case, I see my time has run. The problem that we see in this case, Your Honor, is that we don't know what to believe. It was Petitioner's burden to prove his claim. I don't know what to believe from your argument, Counsel, when you can't even acknowledge the point that's being made. I do acknowledge it. And I apologize again, Your Honor. My effort here is to situate the Board's affirmance of the inconsistencies relied upon by the immigration judge. So let's take the last one and then we'll leave you alone. The last one is that when counsel for the Department of Homeland Security asked him how he had been rendered unconscious, which again is a discrete question not asked to him before, he changed his testimony and stated that during the beating he fell and hit his head and suffered a concussion. Now, why is that a change of testimony? Again, in isolation, it is perhaps not, Your Honor. There are plenty of ways to read each individual response given by Petitioner and to square those with other aspects of his testimony. But the exercise before the story is not. Well, I mean, the net result is he was hit in his kidneys. His stomach was hurt. He lost two teeth. And he was unconscious. And his whole story, there's nothing anywhere where he says that none of those things are true. Except that in his first written affidavit, Your Honor, Petitioner failed to make any statements. Okay, but nobody – that's true. But nobody has relied on that. Not the immigration judge and not the BIA. And his mother, whose asylum claim came before that, did say he was beaten. So I don't know why he left it out, but nobody seems to care about that. Except you. You care. We would respectfully, very respectfully, Your Honors, disagree that the agency did not consider inconsistencies between his written and oral representation. But you couldn't show me where it did. We would look to the board's decision and read each of its – I just read it all. It's not here. It's not here. See, you've got another problem. It's a systemic problem, too. And I don't know if you consider these things, but the judge on this case has a denial rate in these asylum cases of 82.5 percent. We do have those numbers. Where, you know, during this period, the national average, for whatever all this is worth, is 55.4 percent, even in the first case that preceded that. We've got the same type of situation. And, you know, you have to think about the lives these people live, what they go through, and these home invasions and raping a sister and beating up on the mother, you know. But perhaps, Your Honor, as the government – That's what – these things happen in that world. They happen. We agree. Yeah, okay. And perhaps, as we set forth in that footnote, we include in each of our briefs – And I don't understand why, you know, whoever it is, the Justice Department or whoever, isn't – has become more compassionate in this area. You know, we all thought there'd be hope for change and a little kindness and a little understanding. And then, you know, I'm not mad at you. I think you've come out here and you're doing your best. These are voluminous records. It takes hours and hours and hours to go through them. But it's – you know, you've got – we've got problems in this system because, first of all – I mean, I've said this before – you've got this whole notorious system. You've got this system of a lot of corrupt lawyers in this. Huh? We know that. The Justice Department knows that. I have been told that the attitude is, or the view is, that it's better to have a disbarred lawyer than no lawyer. I mean, I've had cases come in here where one session, one day, I had three disbarred lawyers from Mississippi and some other places. And these notorios, like in the other case, they take people's money. Huh? They fill out these applications. And many times they don't file them. They don't file them. So people think, well, no news is good news. Then they get in the big hot water and we enforce all these strict rules on them. So we're causing a lot of suffering. And a lot of it is with kids who are born here. They're American citizens. They're birthright. We want to kick out their parents. And we want to, you know, when we do that, we're in effect throwing out American-born children. I mean, the whole field needs change. If I might beg the courts in Delaware. But you're not the president. You're not the attorney general. There is, in fact, no American-born child here, or is there? I'm sorry? There is, in fact, no American-born child here. Well, there isn't, Your Honor. But perhaps if there's any good that we do see in the record for us, we do have one asylum application that succeeded in the system. Petitioner's mother prevailed. She appeared before an asylum officer. Oh, but, you know, so that's fine. The mother prevailed. But there are several litigation choices still available to Petitioner. The government would not oppose at all if perhaps settling this case. Well, this gentleman here. I didn't hear what you said. Would not oppose. I'm sorry? I didn't hear what you said. The government would have no opposition if perhaps there are other remedies still available to this Petitioner. We have his mother who was granted asylum. We'd have to investigate where she is presently in the system. But as in any of these cases, we have a decision. We have a particular set of litigation choices that were made. We argue the standards and the burdens that were presented with. But the government would have no opposition to continuing to step through the A-files that we have that issue here. Are you asking for mediation? We would have no opposition, Your Honor. I don't know that I have the authority to come out here and affirmatively request that. But I do state definitively. You're willing to carry that message? Certainly, Your Honor. And, you know, as I've said in both my arguments today, the standards are what they are, and they direct the arguments that we can make. Make your arguments within the bounds of the federal law. And, again, I apologize sincerely for having to step here. No, no, no. Okay. You did sidetrack yourself. It's paramount. We're all involved in a kind of nasty, rotten system. That's the way I feel about it. I very much appreciate the additional time given by the Court. Okay. Thank you. Thank you. All right. You don't need to say anything more. All right. I'll just. He's stretching. I assume that you would be willing to mediate if that's what happened. Well, the only concern with that, Your Honor, would be that I'm not sure what other remedies might be available to him aside from these. Yeah, but the alternative is to go back because there was never a future – a determination about future persecution that was appropriate, so you're not going to win outright, nonetheless. That's correct, Your Honor. I would just argue that he should have been found credible. Okay. Thank you. Thank you.
judges: Pregerson, Fisher, Berzon